**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **EMMA LEE ANDERSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 02-CV-0196-CVE-FHM** |
| | ) | |
| **THE BOEING COMPANY and BOEING** | ) | |
| **NORTH AMERICAN, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER**

On March 29, 2004, this Court certified plaintiffs' salaried compensation and hourly overtime subclasses under Federal Rule of Civil Procedure 23(b)(2). Dkt. # 191. In rendering that opinion, the Court was "mindful that the Tenth Circuit recently reiterated the ability of the trial court to modify or decertify a class at any time before final judgment." Id. at 12. Also the Court noted, "[m]erely because the court has certified a class does not ensure that the case will go to trial." Id. at 60 n.27. At the close of merits discovery in August 2005, defendants submitted their Motion for Summary Judgment and, in the Alternative, to Decertify and Their Motion for Summary Judgment on Plaintiffs' Individual Non-Class Claims (Dkt. # 293), and plaintiffs submitted their Renewed Motion for Certification of Rule 23(b)(3) Class (Dkt. # 298). On October 7, 2005, the Court stayed the case, pending the Tenth Circuit's decision in Carpenter v. Boeing, 456 F.3d 1183 (10th Cir. 2006). Dkt. # 357. The Court ordered parties to submit simultaneous memoranda on the impact of Carpenter within twenty days of that decision. Dkt. # 360. On August 7, 2006, the Tenth Circuit rendered its decision in Carpenter. Both defendants and plaintiffs have submitted briefs discussing the Tenth Circuit decision and its impact on this case. See Dkt. # 385 (Plaintiffs' Brief), Dkt. # 386 (Defendants' Brief), Dkt. # 390 (Plaintiffs' Response), and Dkt. # 391 (Defendants' Response).

Now before the Court are defendants' Motion for Summary Judgment on Plaintiffs' Class Claims or, in the Alternative, to Decertify and Their Motion for Summary Judgment on Plaintiffs' Individual Non-Class Claims (Dkt. # 293) and plaintiffs' Renewed Motion for Certification of Rule 23(b)(3) Class (Dkt. # 298). Plaintiffs allege that Boeing has engaged in a pattern or practice of discrimination against female employees at its Oklahoma facilities and have adopted employment procedures that have a disparate impact on female employees. Plaintiffs claim that, as a result, women employed by Boeing in Oklahoma are paid less than men for doing the same work and are assigned less overtime than men. Defendants argue that plaintiffs have failed to establish a prima facie case of gender discrimination under either the disparate impact or disparate treatment theories. They argue, in the alternative, that the classes should be decertified for failure to comport with the commonality and typicality requirements of Fed. R. Civ. P. 23(a).

In this opinion and order, the Court will first discuss the class issues. Section I, below, addresses the issue of decertification. After merits discovery, the Court determines that the requirements of commonality and typicality are not met with respect to plaintiffs' salary subclass. Thus, it grants defendants' motion to decertify that class. Section II addresses defendants' motion for summary judgment with respect to the class claims. In light of <u>Carpenter</u>, the Court determines that defendants are entitled to summary judgment on plaintiffs' overtime class claim. Section III addresses plaintiffs' individual non-class claims. The Court determines that some of plaintiffs' individual non-class claims survive summary judgment, and others do not.

# I.

As a preliminary matter, the Court notes that it should and will discuss the issue of decertification before turning to defendants' motion for summary judgment. Defendants argue that the Court need not reach the issue of decertification because plaintiffs have failed to establish a prima facie case of class-wide gender discrimination for either their salary or overtime subclass claims. In some instances, the Court may rule on the merits before considering certification issues. See 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.61[7], 23-29 (3d ed. 2003) ("[A] district court may, in proper circumstances, rule on a dispositive motion before ruling on class certification.") Indeed, in this case, the Court granted in part defendants' motion to dismiss certain claims before reaching the certification issue. Dkt. # 88. Here, defendants' argument that plaintiffs have failed to establish class-wide discrimination with respect to their salary subclass claim speaks to whether the class is appropriately certified, not whether plaintiffs have met their burden of establishing a prima facie case of discrimination. By contrast, as is discussed in greater detail below, defendants' argument regarding the overtime subclass speaks more to the merits of plaintiffs' claim; thus, the Court will address that argument in the summary judgment section. Since any ruling on summary judgment will affect the rights of the class, the Court will first consider whether the existing subclasses remain viable under Rule 23.

Under Fed. R. Civ. P. 23(c)(1)(A), the Court must "at an early practicable time" determine whether to certify the action as a class action. Here, before full merits discovery, the Court entered a lengthy order granting certification of plaintiffs' salary and overtime subclasses, both with respect to plaintiffs' disparate treatment and disparate impact claims. At that time, the Court noted that it could modify or decertify a class or subclass at any time before final judgment. Dkt. # 191, at 12;

3

see also, Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res., Inc.), 354 F.3d 1246, 1261 (10th Cir. 2004) ("[A] trial court overseeing a class action retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment"); Fed. R. Civ. P. 23(c)(1)(C) ("An order under [Rule 23] may be altered or amended before final judgment").  Indeed, the Supreme Court noted that, even after a thorough consideration of Rule 23(a) requirements, judicial flexibility is allowed to accommodate developments during litigation which may result in the need to modify the certification order.  Gen. Tel. Co. v. Falcon, 457 U.S. 147, 160 (1982).  The initial certification order, therefore, is "inherently tentative."  Id.

Following merits discovery, the Court is in a different position than it was when it ordered class certification.  In determining whether to certify or decertify a class, the Court is not supposed to decide the case on its merits; however, the Court can probe behind the pleadings and examine the facts to determine whether there is evidence of class-wide discrimination.  Since both sides have had an opportunity to engage in discovery, a closer examination of the evidence at this time will not disadvantage either side.  Ultimately, given the evidence submitted by both plaintiffs and defendants, the Court must determine whether the requirements of Rule 23 are still met.

In its order dated March 29, 2004, the Court spent considerable time describing in detail the requirements of Rule 23(a), Dkt. # 181, at 13-29; thus, it will not reiterate such a discussion here. In review, Rule 23(a) requires numerosity, commonality, typicality, and adequacy of representation. As was the case in March 2004, there is no doubt that the numerosity and adequacy of representation requirements are met.  Even after merits discovery, defendants do not dispute that plaintiffs satisfy the numerosity and adequacy of representation requirements.  The  Court will focus on the other

4

Rule 23(a) requirements: commonality and typicality.  The Court will address first the salary subclass and then the overtime subclass.

**A.**     **Salary Subclass**

      **1.**     **Commonality**

As addressed in the Court's certification order, commonality requires that plaintiffs identify a single question of law or fact common to the class.  Dkt. # 191, at 13; <u>see</u> <u>J.B. ex rel. Hart v. Valdez</u>, 186 F.3d 1280, 1288 (10th Cir. 1999).  Here, with respect to the salary subclass, plaintiffs maintain that there are several common questions of law or fact, including whether there are statistically significant gender disparities in salaried compensation and whether Boeing's senior officials had or have knowledge of long-term gender disparities in salaried compensation but failed to correct those gender disparities.  Dkt. # 13-14; Pl. Motion for Class Certification, Dkt. # 127, at 32-33.

In supporting their claim of class-wide gender discrimination in Boeing's salary practices, both under disparate impact and disparate treatment theories, plaintiffs rely heavily on statistics. This was also the case in March 2004, when the Court initially certified the class.  Bernard R. Siskin, Ph.D., ("Siskin") conducted two sets of statistical analyses, one in the pre-certification stage (i.e., before the Court entered its March 2004 opinion) and one later in the merits discovery. The Court will refer to these two studies as Siskin Model 1 and Siskin Model 2, respectively.  In Siskin Model 1, Siskin controlled for career path.  In other words, he differentiated the employees "by the career path by which they arrived at their current position."  Dkt. # 296, Ex. 17, Siskin 1/31/2005 Rpt., at 2.  Siskin explained, "someone who spent four years as a non-exempt employee before entering an exempt job may be expected to earn less than someone who spent two years as an hourly employee

and two years as a non-exempt employee before entering the same exempt job." Id.  But in Siskin

Model 2, Siskin did not control for an employee's career path; he only considered his or her job

classification at the time of the study.  Id. at 1-2.  Both studies analyzed salaries by job aggregation

group ("JAG"), but Siskin Model 2 showed higher aggregated disparities. Dkt. # 296, Ex. 15, Siskin

3/10/2003 Rpt., at 5 n.1; Dkt. # 296, Ex. 20, Siskin 1/31/2005 Rpt., Tables 20-25.

In their response to defendants' motion for summary judgment, plaintiffs criticize defendants

for relying on Siskin Model 1.  Plaintiffs note, "Boeing focuses much of its attack on the model

Siskin used at the class certification stage [i.e. Siskin Model 1]." Dkt. # 318, at 38.  Plaintiffs even

refer to Siskin Model 2 as the "Corrected Model."  The Court agrees with plaintiffs that Siskin

Model 2 is relevant to the issue of certification; however, plaintiffs wrongly imply that Siskin Model

1 is no longer relevant.  Plaintiffs never argue that the original model is statistically flawed.  Rather,

plaintiffs rely on Siskin Model 2 because it shows higher aggregated disparities between men and

women's salaries.  Plaintiffs never explain why Siskin Model 2 presents a superior statistical

analysis.  They merely state that there is no "necessary connection" between an employee's prior

pay code and his or her job at Boeing.  Dkt. # 318, ¶ 87.  They argue that Boeing's statistical expert

did not provide evidence that, as between a male and female employee now occupying the same

exempt position at the same level, the man will perform better because he was previously an hourly

worker while the woman was a non-exempt employee.  Id., ¶ 88.  But plaintiffs offer no argument

why the career path control was inappropriate in the first place.

Plaintiffs' statistics do not support a finding of class-wide discrimination in pay between

male and female employees.  As defendants point out in their brief, in Siskin Model 1, across most

JAGs, there was no statistically significant evidence that women received lower pay than their male

counterparts. Dkt. # 296, Ex. 19, Siskin 1/31/2005 Rpt. Tables 10-15. Under this model, only three[1]

of nineteen JAGs showed a standard deviation adverse to women greater than 1.96.[2]  Even within

these three JAGs, the standard deviation was not greater than 1.96 for the entire period of putative

liability.  Moreover, four of the nineteen JAGs show that women were actually favored in salary.[3]

Id.  Thus, as least with respect to the results of Siskin Model 1, there is no statistical showing of

class-wide salary discrimination at Boeing.  The statistics show that, in some JAGs, men were paid

more than women; in other JAGs, women were paid more than men.

Even in Siskin Model 2, there are differences in pay disparities among the JAGs.  Under this

study, only three of the JAGs had any statistically significant standard deviation adverse to women.[4]

Dkt. # 296, Ex. 20, Siskin 1/31/2005 Rpt. Tables 20-25.  Siskin Model 2 also showed that, in some

JAGs, women were paid slightly more than men, though these numbers were not statistically

significant.  Id.  Thus, even under plaintiffs' preferred statistical data set, there is no evidence of

class-wide discrimination; on the contrary, there are substantial differences between men and

women's salaries between JAGs.  Thus, plaintiffs' statistical analysis does not show that there are

---

[1]     These JAGs were Engineering/Technical Support, Materials Management Support, and
Product Support.

[2]     Standard deviations greater than 1.96 are considered statistically significant.

[3]     However, of these four JAGs, only the Supplier Mgmt/Procurement JAG showed statistically
significant benefits for women.  The other three JAGs (Accounting & Finance; Info
System/Computing; Product Engineering) showed standard deviations less than 1.96.

[4]     These three JAGs were Eng/Tech Support, Product Support, and Supplier
Mgmt/Procurement.

common questions of law or fact as to whether there are statistically significant gender disparities in salaried compensation.

Before leaving its discussion of plaintiffs' statistical analysis pertaining to the salary subclass, the Court will explain in more detail the reason for its departure from its March 2004 order granting certification of the salary subclass. The Court recognizes that, in its March 2004 order, it relied upon Siskin Model 1 and found that the statistics presented therein were not so fatally flawed as to prevent class certification under either the commonality or typicality requirements of Rule 23(a). However, as noted above, the Court specifically premised that finding on the grounds that it could revisit that determination on a later date. Dkt. # 191, at 12. When it made its decision in March 2004, merits discovery had not been completed; thus, the Court leaned towards certifying the class and gave plaintiffs the benefit of the doubt that they could prove class-wide salary discrimination. As the Tenth Circuit has noted, "if there is an error to be made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification." Esplin v. Hirschim, 402 F.2d 94, 99 (10th Cir. 1968) (citations omitted). Now since both parties have completed merits discovery, the Court no longer feels the need to give the plaintiffs the benefit of the doubt. At this point, the Court can and did examine both the Siskin Model 1 and Siskin Model 2 with greater scrutiny. The statistics, under both Siskin Model 1 and Siskin Model 2, show that there is no *class-wide* disparate impact or disparate treatment. Plaintiffs' evidence merely shows *pockets* of disparate impact within certain JAGs.

Plaintiffs anecdotal evidence does little to change the Court's determination that there is no class-wide salary discrimination. While the Court will not reiterate each anecdote of salary discrimination, it will provide some examples of plaintiffs' anecdotes to assess whether there is a

8

common issue of fact or law concerning the alleged wage discrimination. According to Peggy Sturm, she was paid less than several men in the Quality Control department, despite the fact that she had more education than them. Dkt. # 136, Peggy Sturm Decl., ¶¶ 2, 3. When she requested raises, she was told that she already made enough money. Id., ¶ 4. Carol Maxwell, an employee at Boeing and its predecessors since 1977, claimed, "Boeing has generally paid (and continues to pay) women less than men in this facility. The pay disparity is not limited to one or two or even a small handful of job classifications. Instead, equal pay is the exception rather than the rule." Dkt. # 134, Carol Maxwell Decl., ¶ 2. In the payroll department where she worked, Maxwell was promoted to payroll-accounting analyst; however, she was not informed of an opening for a "lead" position paying almost twice her salary. Id., ¶ 3. The position was filled by a man, though Maxwell claims that she made most of the decisions for the payroll group. Id., ¶ 4. Joyce Kellione provides the following account of the pay disparity at Boeing:

> Other male co-workers have consistently been paid more than me for doing the same work. David Watkins was also a materials management analyst and even as a lower Grade 1 he was paid more than me. . . . In addition, I had more seniority than Mr. Watkins and I, in fact, trained him to be a materials management analyst.

Dkt. # 132, Joyce Kellione Decl., ¶ 5. These anecdotes represent only a few of the several personal accounts of alleged wage discrimination at Boeing.

The Court does not find that these anecdotes are sufficient to show commonality among the salary subclass. These isolated accounts of gender discrimination merely reinforce the statistical findings. Plaintiffs statistics show that, in some JAGs, women are paid more than men. But the statistics also show that, in other JAGs, women tend to be paid either the same or slightly more than men. The fact that some women are, in fact, paid less than male employees at Boeing does not

necessarily mean that, on a class-wide basis, Boeing's salary practice has a discriminatory impact on women.  In other words, Sturm, Maxwell, and Kellione may share common issues of fact or law with other female employees in JAGs where there is evidence of pay disparity; but they do not share common issues of fact or law with women in JAGs with no showing of pay disparity or even a showing of pay advantage.

With respect to their disparate treatment claim, plaintiffs argue that there are also common issues of law or fact concerning Boeing's corporate knowledge of salary discrimination. Plaintiffs argue that, while Boeing knew that there were disparities in male and female salaries, it failed to respond adequately to remedy those pay disparities. In its March 2004 order, the Court set forth plaintiffs' argument and evidence in detail. Dkt. # 191, at 18-24. Plaintiffs' evidence concerning corporate knowledge of discrimination concerns the intent element of a disparate treatment claim. See infra Section II(B).  But the Court need not reach the issue of discriminatory intent in a disparate treatment claim if, as the Court has determined, there is no class-wide disparate treatment. Indeed, it would be odd for the Court to determine that the salary subclass should remain certified based on common issues of Boeing's alleged intentional discrimination when some women in the existing subclass receive equal or greater pay as compared to their male counterparts. By definition, Boeing's alleged intentional discrimination relates only to those female employees who were actually paid less than their male counterparts.

### 2.    Typicality

For the reasons similar to those stated above, the Court also determines that the typicality requirement under Rule 23(a) is not met.  Under the typicality requirement, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class

members." <u>E. Texas Motor Freight Sys., Inc. v. Rodriguez</u>, 431 U.S. 395, 402 (1977) (citations omitted).  Here, plaintiffs allege that class representatives Anderson and Sanders were paid less than their male counterparts.  Even if this is the case, as discussed in detail above, the statistics show that other female employees in the existing salary subclass did not have similar experiences.  Thus, the class representatives do not necessarily have injuries or claims typical of the entire class.

### 3.    Conclusion

Plaintiffs' statistics relating to compensation show neither commonality nor typicality.  Rather the statistics show that the experience of female employees at Boeing differed over time based on their JAG.  Female employees in JAGs for which there was never a statistically significant disparity adverse to women do not share common issues with female employees in JAGs where such a disparity exists.  As a result, the Court will decertify plaintiffs' salary subclass claim.  This decision does not preclude the possibility that plaintiffs have a disparate impact and/or disparate treatment claim with respect to certain JAGs or that plaintiffs have sufficient evidence for some individuals claims of gender discrimination in violation of Title VII.  But, at this point, the Court finds that there is no evidence of class-wide discrimination, at least with respect to the salary subclass that the Court certified in March 2004.

**B.**     <u>**Overtime Subclass**</u>

The Court must also reexamine whether the overtime subclass still meets the requirements under Rule 23(a) and (b)(2).  By contrast to the salary subclass, the Court determines that the overtime subclass continues to meet the requirements under Rule 23(a) and (b).  Unlike the salary subclass,  plaintiffs' statistics show consistent disparities between Boeing's male and female employees in the percentage of overtime hours worked and the overtime paid.  In each year between 1998 and 2003, men worked more overtime and received greater overtime pay than female employees. See Dkt. # 171, Siskin Decl., Tables 17A-17D.  In almost every case, the results were statistically significant.  <u>Id.</u>   Thus, for the same reasons set forth in it previous order granting certification of plaintiffs' overtime claim, Dkt. # 191, at 17, the Court determines that this class is still validly certified.

In their motion for summary judgment and, in the alternative, to decertify, defendants argue that plaintiffs' statistics fail to take into account the amount of overtime offered to female employees.  They also argue that the statistics do not compare qualified men and qualified women.  As the Court noted in its previous order, "Boeing's objection to plaintiffs' statistical evidence regarding overtime is more appropriate at the merits stage."  Dkt. # 191, at 17.  Indeed, this issue was addressed directly in <u>Carpenter</u> in the summary judgment context.  Thus, the Court will address defendants' arguments at length, below.

## II.

In their motion for summary judgment with respect to the class claims, defendants argue that plaintiffs have failed to make out a prima facie case of discrimination with respect to either their salary subclass claim or their overtime subclass claim. As noted above, the Court determines that defendants' argument regarding plaintiffs' salary subclass claim concerns the viability of the salary subclass under Fed. R. Civ. P. 23. Since the Court will grant defendants' motion to decertify the salary subclass and deny its motion to decertify the overtime subclass, the Court will address defendants' motion for summary judgment only with respect to the overtime subclass.

### A.    Legal Standard for Summary Judgment

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  In its review, the Court construes the record in the light most

13

favorable to the party opposing summary judgment.  <u>Garratt v. Walker</u>, 164 F.3d 1249, 1251 (10th Cir. 1998).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  <u>Anderson</u>, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Id.</u> at 251-52.

**B.**       **Legal Standards for Disparate Impact and Disparate Treatment Claims**

Before proceeding to the remaining claims, it is worthwhile to set out, in brief, the legal standards for Title VII claims brought under the disparate impact and disparate treatment theories. Disparate impact claims involve employment practices that are facially neutral but that result in differential impact between groups.  <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 335 (1977); <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 431 (1971).  Disparate impact claims require no proof of discriminatory intent.  Disparate treatment claims, by contrast, involve differential treatment of persons based on their race, sex, color, religion, or national origin. In disparate treatment claims,  proof of discriminatory motive is essential; however, discriminatory motive can be implied from the facts.

To survive summary judgment on a disparate impact claim, plaintiffs first must carry the burden of making a prima facie case of discrimination.  To make a prima facie case, plaintiffs must show that "a specific identifiable employment practice or policy caused a significant disparate impact on a protected group."  <u>Murphy v. Derwinski</u>, 990 F.2d 540, 544 (10th Cir. 1993); <u>see</u> <u>also</u> <u>Wards Cove Packing Co. v. Atonio</u>, 490 U.S. 642, 657 (1989).  Plaintiffs must show that there is a legally significant disparity between, on the one hand, the gender composition of the pool of

14

employees who enjoy the job or job benefit and, on the other hand, the gender composition of the qualified applicant or employee pool.  <u>Carpenter</u>, 456 F.3d at 1193; <u>Crum v. Alabama</u>, 198 F.3d 1305, 1312 (11th Cir. 1999).  Once plaintiffs have made a prima facie case of discriminatory impact, the burden shifts to defendants to rebut plaintiffs' statistics or to show that the allegedly discriminatory practice is mandated by business necessity. <u>Griggs</u>, 401 U.S. at 431.  Alternatively, to avoid a finding of discrimination, defendants can show that the practice has a "manifest relation to the employment in question." <u>Connecticut v. Teal</u>, 457 U.S. 440, 446 (1982). Even if defendants demonstrate a business necessity, plaintiffs may still prevail by showing that the employer used the practice in question as a mere pretext for discrimination or that other employment practices without a significant discriminatory effect would also "serve the employer's legitimate interest in efficient and trustworthy workmanship." <u>Albermarle Paper Co. v. Moody</u>, 422 U.S. 405, 425 (1975).

To survive summary judgment on a disparate treatment claim, plaintiffs also carry the burden of establishing a prima facie case.   To establish a prima facie case of disparate treatment, "a plaintiff must show more than accidental or sporadic incidents of discrimination; she must show that 'discrimination was the company's standard operating procedure – the regular rather than the unusual practice.'" <u>Pitre v. W. Electric Co.</u>, 843 F.2d 1262, 1267 (10th Cir. 1988) (quoting <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 355 n.15 (1977)).  If plaintiffs make their prima facie case, then defendants must present evidence from which a reasonable inference of no disparate treatment may be drawn.  <u>Hazelwood School Dist. v. United States</u>, 433 U.S. 299, 309 (1977).

C.     __Overtime Subclass Claim__

Plaintiffs allege that defendants' overtime policy resulted in female employees receiving consistently fewer overtime assignments than their male counterparts.  With respect to their disparate impact claim, plaintiffs identify Boeing's failure to supply  guidance to its managers on how to choose among eligible employees as the "particular employment practice" that caused a disparate impact on the basis of sex.  42 U.S.C. § 2000e-2(k)(1)(A)(i).  Indeed, one Boeing manager stated that there is "no policy" for whom managers ask to work overtime and that "it's pretty much up to management discretion" to determine which employee gets overtime work.  Dkt. # 318, ¶¶ 143, 144.  Without a more uniform system, plaintiffs allege that female employees are less likely to get overtime work.

In demonstrating the alleged disparate impact on women, plaintiffs rely heavily and primarily on statistical evidence.  In Siskin's statistical analysis of overtime work, he found that "Boeing's data shows a consistent and highly statistically significant pattern adverse to females as a group in all aspects of overtime for hourly workers between 1998 and 2003, whether measured by percent who worked overtime, overtime hours worked, overtime hours paid, or overtime dollars paid."  Siskin Decl., Dkt. # 171, ¶ 24.  He compared "similarly situated employees and then compare[d] various measures for males and females in similarly situated cohorts." Id. ¶ 26  He defined similarly situated employees as "those who worked full time during the time period and were in the same job, grade, department and on the same shift." Id. ¶ 26.  The measures considered were: (1) the likelihood of working any overtime (i.e., percent who worked overtime); (2) the average number of overtime hours worked; and (3) the average overtime paid. Id.  According to Siskin, if females were a certain percentage of the cohort, then they should be the same percentage

16

of those working overtime and receive the same percentage of overtime hours and dollars. However, Siskin found statistically significant disparities between the amount of overtime worked by male and female employees.  See Id., Tables 17A- 18B.  Siskin concluded, "Clearly, something in the overtime process consistently results in males obtaining more overtime and double-time hours than females."  Id. ¶ 28.

Defendants argue that these statistics are not sufficient to establish plaintiffs' prima facie case because the statistics fail to take into account the amount of overtime *offered* to female as compared to male employees.  Dkt. #296 at 37.  In addition, they argue that the statistics are insufficient because Siskin "failed to consider who was qualified to work overtime."  Id. at 38.  In the Carpenter case, defendants made both of these arguments; however, the Tenth Circuit focused on the latter.[5]  456 F.3d at 1194.  Here, too, the Court will focus on the issue of whether plaintiffs' statistics  adequately compared men and women who were qualified for overtime work.

In Carpenter the court made clear that "it is not enough for Plaintiffs to show simply that more overtime assignments go to men than to women, or even that men get a higher percentage of those assignments than their percentage in the work force."  Id.  Rather, to survive summary judgment, plaintiffs "must compare *qualified* men to *qualified* women."  Id. (emphasis in original). Indeed, the essential requirement for statistics in Title VII cases "is that the data concern those persons subject to the challenged employment practice."  Id. at 1196.  "[A]bsent a close fit between

---

[5]      Contrary to plaintiffs' argument that the Carpenter court "did not accept Boeing's argument that Siskin must control for overtime offers or declines," Dkt. # 385 at 2, the court merely did not address that issue.  Rather, the court found that the statistics did not compare qualified men and women; thus, the court had no reason to address Boeing's other argument about offers and declines.

17

the population used to measure disparate impact and the population of those qualified for a benefit, the statistical results cannot be persuasive." Id. at 1197.

Here, there is no doubt that plaintiffs' results are statistically significant; however, this does not mean that plaintiffs have met their burden to establish a prima facie case of discrimination. The large number of standard deviations merely illustrates that the difference in assignment of overtime to male and female employees was not a random event. As Siskin pointed out, the statistics reveal that "something" caused men to obtain overtime more often than women. Siskin Decl., Dkt. # 171, ¶ 28. "The large number of standard deviations tells us nothing about what that 'something' is, however, other than that it is not based on differences in job, grade, budget code, or shift." Carpenter, 456 F.3d at 1202.

At the Boeing facilities in Tulsa and McAlester, all hourly employees were represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") under a collective bargaining agreement ("CBA").[6] Dkt. # 163, Harank Decl. ¶ 2. Under the CBA, Boeing was contractually obligated to assign overtime by the procedures set forth therein. The CBA required that overtime for employees in a specific overtime group "be equalized among the employees in the group engaged in similar work as far as practical." Dkt. # 163, Harank Decl., Ex. A, § 2(a), Collective Bargaining Agreement. The CBA sets forth specific

---

[6]     During the relevant period, there were two different CBAs. The first CBA, which was between Boeing predecessor and UAW, was effective from June 25, 1996 through June 21, 1999.  Dkt. # 163, Harank Decl. ¶ 2.  In 1999, UAW and Boeing negotiated a new CBA, effective from June 22, 1999 through May 14, 2003.  Id.  The relevant overtime provisions for these CBA agreements are virtually identical.

procedures to augment an overtime group with employees outside the group.  Specifically, the CBA

provided the following procedure to govern the selection of such employees:

> *First* – Employees from another overtime group in the same department,
> classification and shift and who are among those low on overtime within their own
> group, will be asked to work.
> *Second* – In the event there are no employees available in the same
> classification and shift in the department in which the need arises, the selection shall
> be from some other department within the same classification and shift and shall be
> from among employees who are low on overtime within the group from which the
> employees are selected.
> *Third* – In the event there are no employees available as described above,
> the selection shall be made from other classifications within the originating
> department on the same shift and shall be from among employees who are low on
> overtime within the group from which the employees are selected.
> *Fourth*– In the event the above outlined sources are exhausted, the Company
> shall select from among other available employees.

Id.  The CBA further states, "In all cases, the selection will be predicated on the employee's ability

to perform the work."  Id.  Thus, Boeing could not offer overtime to any employee; under the CBA

terms, it had to offer the overtime to employees in particular overtime groups before employees in

other groups.

The Siskin study did not incorporate the CBA requirements in its statistical analysis.  In

particular, Siskin did not determine which employees were in the same overtime group as the

department seeking overtime workers.  As the Tenth Circuit noted in Carpenter, this failure to

include the CBA requirements can skew the results.  456 F.3d at 1198.  If, for example, overtime

assignments were concentrated in a particular overtime group, and there were few women in those

groups, then women would work overtime less than men.  Since the Siskin study does not isolate

the effect of supervisor discretion from the effect of the CBA requirements, it is not limited to data

regarding *qualified* persons subject to the challenged practice.

In <u>Carpenter</u>, the Tenth Circuit noted that "the population selected for statistical analysis need not perfectly match the pool of qualified persons." <u>Id.</u> at 1197. If the data upon which plaintiffs rely is not restricted to qualified employees, as is the case here, then plaintiffs must (1) show that reliable data with respect to that group are unavailable and (2) establish the statistical analysis uses a reliable proxy for qualification. <u>Id.</u> Here, plaintiffs argue that data on "overtime group" was not available because Boeing's forms specifying employees' overtime group were inaccurate. Plaintiffs claim that the forms were not monitored for accuracy and that they often contained incorrect numbers. <u>See</u> Dkt. # 318, ¶¶ 148-51. Given the allegedly unreliable data on overtime groups, plaintiffs argue that Siskin was justified in not controlling for overtime group. Plaintiffs argue that Siskin's use of "department" was a reliable proxy for overtime group. Dkt. # 385, 13-14. Plaintiffs defend the use of department as a reliable proxy because Siskin found that, when he did consider overtime group, it did not materially change his findings based solely on department. According to Siskin, "some preliminary data analyses indicated that the results controlling for overtime group did not materially differ from simply controlling for department." Siskin 3/15/05 Decl., ¶ 9.

As a preliminary matter, if Siskin's results controlling for overtime group did not change his results that only controlled for department, then it is unclear why Siskin did not use overtime group in his analysis. Indeed, if the overtime group data was unreliable, then it would appear that his findings incorporating overtime group would not comport with his findings controlling for department. Thus, plaintiffs have undermined their own argument that overtime group data is unreliable. It is likely that Siskin controlled for department rather than overtime group because such information was more readily available in electronic form. However, plaintiffs cannot base

their statistical analysis on different measures solely because the more accurate data is more difficult to obtain. Plaintiffs have themselves pointed out that overtime group data is accessible; Siskin conducted some statistical analysis using overtime group data. Moreover, the Court is not convinced that department is an inherently more reliable form of data than overtime group. Plaintiffs argue that overtime group data was prone to human error; but the same holds true for department data. In any form of data – electronic or paper – there is always the potential for human error. Merely pointing out that some overtime group data is incomplete and contains errors does not automatically mean that the data is unfit for statistical analysis.

The Court is also unconvinced that department is a reliable proxy for overtime group. According to the CBA procedures, overtime work is assigned not merely by department. There is a specific process whereby overtime work is assigned to employees within the same  department, classification, and shift. Merely categorizing employees by department does not take into account the procedures set forth in the CBA. Moreover, several departments have multiple overtime groups, thereby suggesting that department is not a reliable proxy for overtime group. Dkt. # 296, Ex. 14, Harank Decl., ¶ 3. Therefore, plaintiffs have failed to show that the variables in the Siskin study produce a "reliable surrogate for qualifications for overtime; that is, that the results adequately reflect comparisons between individuals who were equally eligible for overtime assignments under the CBA." Carpenter, 456 F.3d at 1199.

In the Carpenter decision, the Tenth Circuit looked solely at the plaintiffs' statistical evidence and did not consider any anecdotal evidence.[7] Here, while statistical data constitutes the bulk of their evidence of gender discrimination, plaintiffs offer some anecdotal evidence. Thus, the Court must determine whether this anecdotal evidence, in conjunction with the statistical evidence, is sufficient to meet plaintiffs' prima facie case. Indeed, "all of the evidence, statistical and nonstatistical, tending to establish a prima facie case should [be] assessed on a cumulative basis." Pitre, 843 F.2d at 1268 (quoting EEOC v. Am. Nat'l Bank, 652 F.2d 1176, 1188 (4th Cir. 1981)). "If the statistical disparity is insufficient alone to establish a prima facie case, the plaintiff may get over his or her initial hurdle by combining statistics with historical, individual, or circumstantial evidence." Id. (quoting Payne v. Travenol Lab, Inc., 673 F.2d 798, 817 (5th Cir. 1982)).

While the Court will not reiterate each piece of anecdotal evidence supplied by plaintiffs, it will provide a brief summary of the types of anecdotal evidence pertaining to the alleged gender discrimination in overtime pay. According to Renna Banks, "I have consistently been given less overtime opportunity than males in Maintenance Utility." Dkt. # 130, Renna Banks Decl., ¶ 3. She noted that, although the Boeing policy was to give overtime opportunities to persons with fewer hours, she had fewer overtime hours than a male employee, Mr. Webb, and yet Mr. Webb was asked to work overtime instead of Banks. Id. Banks submitted a grievance with UAW about the

---

[7]     The Tenth Circuit explained: "On appeal Plaintiffs contend that their statistical evidence of disparate impact suffices to preclude summary judgment. (In district court Plaintiffs also presented a variety of anecdotal evidence to support this claim. But because on appeal they do not rely on that evidence in challenging summary judgment, we will consider only the statistical evidence.)" Carpenter, 456 F.3d at 1194.

incident; in response, Boeing gave her some overtime pay and said that "every effort is being made to equalize overtime." Id. In another instance, Banks was afforded the opportunity to work overtime on a Sunday, but the overtime schedule was cancelled. Other male employees were still permitted to work that Sunday. In her declaration, she stated, "I felt I was treated unfairly by canceling my overtime opportunity and allowing other males to work." Id., ¶ 5.

Other female employees offer similar accounts. Daryl Dee Wheeler stated in her declaration in support of class certification: "overtime hours are not equalized between males and females in my Paint-Processing department for several reasons. First the overtime books are inaccurate. Also, there is no monitoring of managers' maintenance of these books and how managers distribute overtime." Dkt. # 137, Daryl Dee Wheeler Decl., ¶ 8. She noted, "Males within the 'good ole boys' network seem to benefit most from overtime opportunity." Id. ¶ 11. According to Billie Kitch, "I believe my overtime hours were manipulated in order to shut me out of future overtime opportunity. In March 2002, I had less overtime hours than most males in my group." Dkt. # 133, Billie Kitch Decl., ¶ 5. Similarly, Florence Dobbs reported that some male co-workers worked almost 200% more overtime hours than she had worked. Dkt.# 131, Florence Dobbs Decl., ¶ 3. Management gave her "excuses" for not giving her more overtime, such as her lack of training. Id., ¶ 8. She says that she repeatedly asked for more training, but was denied that opportunity. Id.

The Court notes that several of plaintiffs' "anecdotes" merely state that they believed themselves to be discriminated against in the overtime policy. Their subjective beliefs are not sufficient to meet plaintiffs' burden of establishing a prima facie case. The more specific evidence concerning particular instances of denial of overtime work is more persuasive; nonetheless, the Court determines that this evidence still falls short of the required prima facie showing. In some

23

circumstances, the female employees admit that they were denied overtime opportunities because they were not as trained as their male counterparts. Thus, there were valid reasons for denying such overtime. It is certainly possible that Boeing has a training policy that discriminates against women, but there is simply not enough evidence before the Court to make such a determination on a class-wide basis. Moreover, it is still unclear whether the female employees make "bottom-line comparisons without considering all the factors set out under the CBAs." Carpenter v. Boeing, 2004 WL 2661691 (D. Kan. February 24, 2004). Thus, the Court determines, as a matter of law, that plaintiffs have failed to meet their burden of establishing a prima facie case of disparate impact for the overtime subclass claim.

With respect to their disparate treatment claim, plaintiffs argue that Boeing's allegedly discriminatory overtime policy "was the company's standard operating procedure – the regular rather than the unusual practice.'" Pitre, 843 F.2d at 1267. As noted above, a disparate treatment claim requires proof of intent to discriminate; however, intent can be inferred from the circumstances. In this claim, plaintiffs rely on the same statistical and anecdotal evidence as that relied on in their disparate impact claim. Thus, the Court's analysis is not substantially different from that above. Once again, the Court determines that the statistical analysis is not sufficient to prove a prima facie case of discrimination and certainly not enough to prove discriminatory intent. Plaintiffs anecdotal evidence is not so widespread as to indicate discrimination on a class-wide basis. See Cooper v. Fed. Reserve Bank, 467 U.S. 867, 877-78 (1984) ("a class plaintiff's attempt to prove the existence of a companywide policy, or even a consistent practice within a given department, may fail even though discrimination against one or two individuals has been proved.").

24

Thus, the Court determines that, as a matter of law, plaintiffs' evidence falls short of that required to make a prima facie case of disparate treatment.

Since plaintiffs have failed to establish a prima facie case of discrimination under either the disparate impact or disparate treatment theories, defendants are entitled to summary judgment on plaintiffs' overtime subclass claim.

**III.**

On September 15, 2005, both parties stipulated to the dismissal with prejudice of certain claims of the individual plaintiffs, pursuant to Fed. R. Civ. P. 41(b).  Dkt. # 314.

Plaintiff Emma Lee Anderson ("Anderson") agreed that the following claims be dismissed with prejudice: (1) the promotion claim relating to the Material Advisor position she sought in 1996; (2) the promotion claim relating to the Material Advisor position she sought in 1997; (3) the promotion claim relating to the Surplus Sales Representative position she sought in 1998 and (4) her claims under the Equal Pay Act.  Dkt. # 314, ¶ 6.  As the named representative for the salary subclass, which the Court has decertified in this order, Anderson maintains an individual action for sex-based salary discrimination.  Additionally, Anderson alleges that defendants failed to promote her to a position in the Purchased Labor Department in 2001.

Plaintiff Katherine Sanders ("Sanders") stipulated that the following claims be dismissed with prejudice: (1) the promotion claim relating to the promotion she sought from level 3 to level 4 in 2000; (2) the training claims associated with the Unix and/or A+ training courses she sought; and (3) her claims under the Equal Pay Act.  Dkt. # 314, ¶ 7.  Sanders, as another named representative of the salary subclass, maintains an individual action for gender discrimination with

25

respect to her salary.  She also brings a claim of gender discrimination for defendants' alleged denial of training and a claim for retaliation.

Plaintiff Florence "Beth" Dobbs ("Dobbs") stipulated that the following claims be dismissed with prejudice: (1) all job assignment claims relating to job assignments prior to May 16, 2001; (2) her claims of co-worker sexual harassment; and (3) her retaliation claim.  Dkt. # 314, ¶ 8.  As one of the class representatives for the overtime subclass, Dobbs brings an individual claim for defendants' alleged denial of overtime opportunity.  Dobbs also claims that defendants discriminated against her on the basis of her sex due to defendants' alleged failure to train her to the same extent as her male counterparts.

Plaintiff Daryl Dee Wheeler ("Wheeler") stipulated that the following individual claims be dismissed with prejudice: (1) all job assignment claims relating to job assignments prior to May 16, 2001; (2) her claim of management sexual harassment; and (3) her claim of co-worker sexual harassment.  Dkt. # 314, ¶ 9.  Wheeler maintains an individual claim for denial of overtime opportunity due to a lack of training.  Also, she claims that, as a result of her comments regarding gender discrimination, defendants retaliated against her by demoting her to the "graveyard shift."

Plaintiff Renna Banks ("Banks") stipulated that the following claims be dismissed with prejudice: (1) all claims associated with disciplinary actions taken against her between 1997 and 2003; (2) all job assignment claims; (3) all promotion claims associated with bids submitted for bargaining unit positions in 1997 and 1998; (4) the promotion claim associated with the salaried position she sought in 1996; (5) any claim of co-worker sexual harassment; and (6) her retaliation claim.  Dkt. # 314, ¶ 10.  Banks also has a claim based on alleged denial of overtime opportunity. She has no additional claims.

Defendants did not move for summary judgment with respect to the individual salary and overtime claims. Thus the individual non-class claims relating to salary and overtime remain.

**A.**     **Legal Standard for Individual Claims of Discrimination**

Before proceeding to the claims of the individual plaintiffs as to which defendants did move for summary judgment, the Court will briefly set forth the legal standards for individual claims of discrimination in the failure to promote, failure to train, and retaliation contexts. The general standard for summary judgment, as set forth in Section II(A), above, also applies.

To survive summary judgment on their gender discrimination claims under Title VII, plaintiffs must satisfy the McDonnell Douglas burden shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). First, plaintiffs must establish a prima facie case of employment discrimination. Id. at 802. Next, defendants must articulate a legitimate nondiscriminatory reason for the employment decision. Id. at 803. Finally, the burden shifts back to plaintiffs to show that Boeing's stated nondiscriminatory reason is mere pretext for unlawful discrimination. Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004).

"[T]he articulation of the plaintiff's prima facie test might vary somewhat depending on the context of the claim and the nature of the adverse employment action alleged." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1227 (10th Cir. 2000). When plaintiffs bring a failure-to-promote claim, plaintiffs must show that they (1) belong to a protected class; (2) were qualified for the promotion; (3) were not promoted; and (4) that the positions remained open or were filled with

persons in a non-protected class.[8]  Amro v. Boeing Co., 232 F.3d 790, 796 (10th Cir. 2000).  To

establish a prima facie case of discriminatory denial of training, plaintiffs must show (1) they are

members of a protected class; (2) defendants provided training to its employees; (3) they were

eligible to receive the training provided by defendants; and (4) they were not provided the training

under circumstances giving rise to an inference of discrimination.  See, e.g., Thompson v. Potomac

Elec. Power Co., 312 F.3d 645 (4th Cir. 2002); Pafford v. Herman, 148 F.3d 658 (7th Cir. 1998).

Plaintiffs establish a prima facie case of retaliation if they show (1) they engaged in protected

opposition to discrimination; (2) they were subject to adverse employment action; and (3) a causal

connection exists between the protected activity and the adverse action.  Kendrick, 220 F.3d at

1234. Despite the slight variation depending on the nature of the adverse employment action

alleged, "the critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that

the adverse employment action occurred under circumstances which give rise to an inference of

unlawful discrimination." Id. at 1227 (internal quotations marks and citations omitted).  If plaintiffs

establish a prima facie case, a presumption of discrimination arises.  Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 142 (2000).

Defendants must then offer, through admissible evidence, a legitimate nondiscrimniatory

reason to rebut the presumption of discrimination.  Texas Dept. of Community Affairs v. Burdine,

---

[8]     This Court recognizes that the Tenth Circuit cases "have sometimes articulated the prima
facie case differently, particularly as to the fourth prong and whether it requires the plaintiff
to show that the person promoted was outside of the protected class to which the plaintiff
belongs." Jaramillo v. Colorado Judicial Dep't, 427 F.3d 1303, 1307 n.1 (10th Cir. 2005).
However, in this case, the fourth prong is not determinative in any of the claims.  In each
instance, plaintiffs claim that the men were the recipients of the benefit (either higher salary,
overtime opportunities, promotions, or training).

450 U.S. 248, 255 (1981); English v. Colorado Dept. of Corrections, 248 F.3d 1002, 1009 (10th Cir. 2001).  Defendants need not at this stage rebut evidence established under the first step; they must only rebut the inference that they acted out of discriminatory animus.  E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1318 (10th Cir. 1992).  The ultimate burden of proving discrimination remains at all times on plaintiffs.  Burdine, 450 U.S. at 253.  If defendants carry their burden of production, the presumption of discrimination drops out of the case.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

To show pretext, plaintiffs must produce evidence that would, if believed by the trier of fact, show that the true reason for the action was discriminatory.  Plaintiffs can produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).  Evidence of pretext may include "prior treatment of plaintiff; the employer's policy and practice regarding disturbing procedural irregularities (e.g. falsifying or manipulating . . . criteria); and the use of subjective criteria."  Garrett v. Hewlett-Packard Co., 305, F.3d 1210, 1217 (10th Cir. 2002) (citations omittied).  Pretext can also be shown "(1) with evidence that the defendant's stated reason for the adverse employment action was false, . . . (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, . . . or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice."  Kendrick, 220 F.3d at 1230.

B.    **Anderson's Failure-to-Promote Claim**

Anderson claims that Boeing discriminated against her on the basis of her sex by failing to promote her to the position of a purchased labor buyer. In 2001, at the Boeing Oklahoma facilities, the amount of purchased parts procurement decreased and the amount of purchased labor procurement increased from previous levels. Dkt. # 307, Ex. 6, Kloster Decl., ¶ 4. Jackie Kloster, a first-level manager in the Supplier Management and Procurement ("SM&P") department in Tulsa, determined that she needed to reassign the work with respect to employees responsible for purchased labor and purchased parts to accommodate the shifting levels of work. According to Kloster,

> To address this shift in work, I determined that James Williams [("Williams")], one of my purchased parts Buyers, could provide part-time assistance to the purchased labor area. I selected Mr. Williams for this task because he had experienced a decrease in his normal purchased parts work, so he had available capacity to assist in purchased labor. In addition, he was a strong performer with a proven ability to quickly pick-up new assignments. Furthermore, it was beneficial to me to have Mr. Williams cross-trained in purchased labor so that he could provide assistance in that area in the future if necessary.

Id., ¶ 5. In addition to the reasons stated above, Kloster claims that she chose Williams because he already worked for her in the SM&P department; Anderson, by contrast, worked in the Maintenance, Repairs, and Operating department. Williams worked three days a week doing purchased labor work to help Steve Lackey ("Lackey"), the primary purchased labor buyer, and two days a week doing his regular purchased parts work. Id., ¶ 6. Kloster "viewed this assignment as temporary in duration and only intended it to last until Mr. Williams' workload in purchased parts returned to its normal level." Id. However, according to Anderson, Kloster did not inform her and the other employees that Williams would only work in the purchased labor department on a

temporary basis.  Kloster's June 19, 2001 email announcing Williams' new job tasks stated that the position was "a reassignment for an employee whose workload has slowed down . . . This also gives us a chance to offer cross training."   Dkt. # 320, Ex. B.   In September 2001, Williams returned to the purchased parts area full-time.  Williams' salary and benefits were unaffected by the change in position.

Anderson claims that she was denied the opportunity to apply for this "promotion" as a buyer in the purchased labor department.  When she saw people moving furniture to create space for Williams, she learned for the first time that there would be a new person responsible for purchased labor procurement.  Dkt. # 320, Ex. A, Anderson Deposition, at 4.  According to Anderson, "So when I found out that there was another position being created to help [Lackey], I called [Kloser] and asked her could I apply for the job and she told me no.  And so she said 'Well, do you want to know why?'  And I said 'No.'  You know, I didn't want to know why.  She denied me the opportunity to apply for the job."  Id. at 5.  Anderson claims that she was more qualified for the position than Williams because she had experience in purchased labor procurement.  Before Williams aided in purchased labor procurement, Anderson served as the back-up buyer for Lackey's desk when he was on vacation or sick.  Id. at 8.  Thus, while Williams required training in purchased labor, Anderson claims that she would not have needed additional training.  Since 2001 when Williams worked part-time on purchased labor procurement, Williams rather than Anderson has done the back-up work for Lackey.   Id. at 11.

Defendants argue that Anderson has failed to make a prima facie case of discrimination because she suffered no "adverse employment action."  They maintain that the purchased labor "position" was not a permanent position; rather it was a temporary, part-time job assignment.  An

adverse employment action is an action that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  According to the Tenth Circuit, "a mere inconvenience or an alternation of job responsibilities" is not an adverse employment action. Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (1998).  The Court agrees with defendants that this employment action did not rise to an adverse employment action.  The evidence shows that the position was temporary in nature and involved a mere shift in job assignment; the fact that Anderson did not know that the position was temporary does not change that fact.  Additionally, Anderson provides no evidence that she suffered as a result of being denied the opportunity to apply for this temporary position.  Williams' salary and benefits did not change as a result of this three-month reassignment; there is no indication that Anderson's salary or benefits would have changed had she been chosen to help with the influx of purchased labor work.

Even if this action did constitute an adverse employment action, Boeing has offered several nondiscriminatory reasons for offering the job to Williams instead of Anderson.  Firstly, Williams' work had "slowed down"; thus, there was reason to partially reassign him to cover the increased purchased labor work.  Secondly, whereas Anderson worked in the Maintenance, Repairs, and Operating department, Kloser preferred to reassign the work someone in the SM&P department with whom she had an existing relationship.  Thirdly, Boeing wanted to cross-train someone who specialized in purchased parts procurement to prepare for future changes in work.  Anderson argues that all these reasons are merely "self-serving declarations" by Kloser that do not constitute admissible evidence in defendants' favor. Dkt. # 320, at 16.  But defendants' arguments are not

merely after-the-fact justifications in light of the pending litigation; nor do their arguments rest on inadmissible evidence.  Kloser's June 19, 2001 email to Anderson and other employees supports defendants' reasons for assigning Williams to handle the additional purchased labor work.  The email cites Williams' slow work in the purchased parts procurement and the chance to cross-train. Anderson offers no evidence that defendants' proffered nondiscriminatory reasons are, in fact, pretextual; she merely asserts that Boeing's real reason for denying her the opportunity to work in purchased labor procurement was the fact that she was a woman.  To avoid summary judgment, Anderson must provide *specific facts* showing that there remains a genuine issue of material fact. Anderson's "mere conjecture that [her] employer's explanation is a mere pretext for intentional discrimination is an insufficient basis for denial of summary judgment."  Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).

Since Anderson did not suffer an adverse employment action, and since she has not shown that defendants' nondiscriminatory reasons are pretextual, defendants are entitled to summary judgment on Anderson's failure-to-promote claim.

**C.**     **Sanders Claims**

**1.**     **Failure-to-Train Claim**

Sanders alleges that she was denied training opportunities that were offered to her male counterparts.  Title VII specifically prohibits an employer controlling apprenticeships, on-the-job training, retraining, or other training programs from discriminating against an individual because of her sex.  42 U.S.C. § 2000e-2(d).  In the training context, nondiscriminatory treatment of employees encompasses both the quality and quantity of training afforded by the employer.

While she was in the E-6 program, Sanders sought training in various courses, including Cisco router, NAMS, MCSE certification, and PeopleSoft. George Eaton ("Eaton"), the E-6 Program Manager, had the authority to approve training requests from employees in the E-6 program. Dkt. #307, Ex. 7, Eaton Decl., ¶ 8. Sanders attended several training programs and participated in some on-line training during her time in the E-6 program. Dkt. # 307, Ex. 3, Sanders Deposition, at 239-45. In October 1999, however, Sanders' male co-worker, Craig Yerdon ("Yerdon"), took a course on Cisco Routers that Sanders did not attend. Id. at 227. Sanders never expressly asked Eaton for Cisco training; she only talked with Yerdon about it. However, she maintains that Yerdon was offered the training and she was not. Dkt. # 320, Ex. C., Sanders Deposition, at 141. The same is true for the NAMS training. According to Sanders, "there was Unix training[9] that was offered to [Yerdon]. There was NAMS training. There was Cisco Router training. I was not offered any of those – and they would all have been beneficial to me." Id. Also, Sanders claims she asked Eaton to attend a multi-day course that led to certification as a Microsoft Certified Systems Engineer ("MCSE"). Dkt. # 307, Ex. 3, Sanders Deposition, at 233-34. Eaton told her that she could not attend that training because it was not in the department budget. Dkt. # 307, Ex. 2, Sanders Deposition, at 150-51. Sanders maintains that Yerdon had an opportunity to participate in MCSE training because he received approval to start a program at Southern Nazarene University, which included MCSE training. Dkt. # 320, Ex. C, at 235. However, Yerdon eventually quit that program. Id. Finally, Sanders alleges that she was denied the opportunity to attend PeopleSoft training, even though her manager expressly asked her to

---

[9]    The Court recognizes that Sanders stipulated that claims pertaining to Unix training be dismissed with prejudice; however, this statement is relevant to her other claims.

34

attend that training. Dkt. # 320, Ex. F, Sanders Decl., ¶ 5.  Managers told Sanders that she could not participate in the PeopleSoft training because her husband was attending the seminar, and their joint attendance would create an appearance of impropriety.  Dkt. # 307, Ex. 2, Sanders Deposition, at 156-58.  The PeopleSoft training was offered to Yerdon.  Dkt. # 320, Ex. F, Sanders Decl. Sanders had eleven (11) years of Information Technology ("IT") experience and a college degree; Yerdon does not have a college degree and has six (6) years of IT experience.  Dkt. # 320, Ex. C, Sanders Deposition, at 157, 161, 164-65.

Defendants argue that Sanders' claim fails as a matter of law because it did not constitute an adverse employment action.  However, as noted above, failure to train in a nondiscriminatory manner is expressly prohibited by Title VII.  Moreover, Sanders provides evidence of pay disparities between her and Yerdon. Viewing the evidence in the light most favorable to Anderson, the nonmoving party, the Court determines that there is sufficient evidence that the lack of training contributed to her lower pay.  Thus, the lack of training constituted an adverse employment action.

Sanders has met her prima facie case of discrimination.  She has shown that Boeing provided training to employees and that she was eligible to receive training given her experience and requests by supervisors that she attend training sessions. Also, the denial of training raises an inference of discrimination given that her male counterparts, like Yerdon, had an opportunity to attend training sessions.

Defendants have articulated nondiscriminatory reasons for denying Sanders training opportunities.  They argue that Sanders did not always follow the proper procedure in asking Eaton directly for training opportunities.  Also, they argue that the cost of training was prohibitive in some instances.  Finally,  with respect to the PeopleSoft training, defendants argue that denying her that

training was proper given that her husband attended the training.  However, the Court determines that Sanders has met her burden of showing facts that, if accepted by a factfinder, would prove that defendants' reasons for denying training opportunities were merely pretextual.  Even though Sanders may not have asked Eaton for all training opportunities, she maintains that training was offered to her male counterparts and not to her.  At minimum, there is a genuine issue of material fact as to whether training was offered equally to her and her male counterparts.  Also, Sanders provides evidence that, while she was denied some training on the ground that it was too expensive, her male counterparts were given the opportunity to attend such training.  Finally, there is a genuine issue of material fact as to whether the Boeing's reason for denying Sanders PeopleSoft training was based on a neutral policy or was merely pretext for denying her training on the basis of her sex.  Thus, the Court denies defendants' motion for summary judgment with respect to Sanders' training claim.

### 2.      Retaliation Claim

Sanders claims that she was denied training opportunities because she had made complaints of discrimination.  As noted above, plaintiff establishes a prima facie case of retaliation if she shows (1) she engaged in protected opposition to discrimination; (2) she was subject to adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action.  Kendrick, 220 F.3d at 1234.  Sanders maintains that, after she complained to the Human Resources Department about the lack of training opportunities and complained to her manager Eaton about unequal pay and treatment in training, she was "continuously denied training opportunities."  Dkt. # 320, at 21; see Dkt. # 320, Ex. C., Sanders Deposition, at 162; Dkt. # 360, Ex. F, Sanders Decl.

Defendants claim that plaintiff has failed to establish a prima facie case of retaliation because she did not show that the denial of training was an adverse employment action or that there was a causal connection between her protected actions and the alleged lack of training. The Court finds that Sanders has failed to raise a genuine issue of material fact as to a causal connection between her comments to her managers and the denial of training. "The causal connection may be shown by producing evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1320 (10th Cir. 1999) (implicitly overruled by National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), on other grounds; see Kendrick, 220 F.3d at 1234. Sanders does not provide sufficient evidence of proximity in time between her comments to managers and specific instances when she was denied training. Sanders provides no additional evidence to show that the denial of training was in retaliation for her comments to managers. Since Sanders has failed to establish a prima facie case of retaliation, the Court grants defendants' motion for summary judgment on that claim.

**D.    Dobbs' Failure-to-Train Claim**

Defendants argue that Dobbs has failed to bring her claim within the limitations period. Dobbs was transferred out of the Process Shop and into the Paint Shop in April 2000. Dkt. # 307, Ex. 5, Dobbs Deposition, at 64-65. Any alleged discrimination that occurred when she was at the Paint Shop is barred by the statute of limitations. Defendants argue that Dobbs' only claims concern her job assignments when she was at the Process Shop. They also point to her EEOC complaint, where Dobbs stated, "From August 1997 to May 2000, I experienced gender discrimination in this department." Dkt. # 307, Ex. 10. Defendants are correct that any claim

relating to her time in the Process Shop is time-barred; however, they neglect to address Dobbs' failure-to-train claim.

Dobbs maintains that she has presented a failure-to-train claim that is not time-barred. She testified that, when she was in the Paint Shop from July 2000 until March 2002, her manager Jeannie King denied Dobbs the opportunity to train as a painter. In her deposition, Dobbs claims, "[Jeannie King] wouldn't let us train as painters . . . . there was me and there was another girl hired in as a painter, passed the paint test, and all she ever got to do was sand parts." Dkt. # 320, Ex. K, Dobbs Deposition, at 85-86. In their reply, defendants contend that this did not constitute an adverse employment action because there was no "tangible, negative effect on her employment." Dkt. # 352, at 23. According to defendants, "Dobbs offers no evidence that her pay or benefits were reduced as a result of the assignments." Dkt. # 352, at 23. However, in her declaration in support of class certification, Dobbs stated that, as a result of the lack of training, she did not receive overtime. See Dkt. # 119, Dobbs Decl. Defendants imply that, because they did not move for summary judgment on Dobbs' individual overtime claim, her references to overtime are misplaced. The Court disagrees. Dobbs' overtime claim and her failure-to-train claim are related. The Court determines that the alleged failure-to-train constituted an adverse employment action because it resulted in fewer overtime hours for Dobbs. Thus, contrary to defendants' argument, Dobbs has made a prima facie case of discrimination. Defendants offer no legitimate, nondiscriminatory reason for the alleged failure to train; therefore, the Court denies defendants' motion for summary judgment on this claim.

**E.**    <u>**Wheeler's Claims**</u>

    **1.**    **Failure-to-Train Claim**

Defendants argue that all of Wheeler's claims are time-barred.  They point to her arguments about receiving "menial and dirty tasks that males in her organization are rarely assigned."  Dkt. # 1, ¶ 100; see Dkt. # 307, at 16.  However, defendants do not adequately address Wheeler's claim that she was discriminated against in receiving less training in painting than her male counterparts.  She maintains that the lack of training continued through the relevant litigation period.  "Since 1997 I have requested training in paint.  Only recently after filing this lawsuit in 2002, I finally received training in paint."  Dkt. # 320, Ex. G, Wheeler Decl., ¶ 6.  Like Dobbs, Wheeler maintains that this lack of training was adverse because it resulted in her being assigned fewer overtime hours than male employees who had received training.  According to Wheeler, "brand new males hired off the street were able to paint and get overtime even though they had less seniority than me."  <u>Id.</u>, ¶ 3.  Wheeler has provided sufficient evidence to make a prima facie case of discrimination with respect to the alleged failure to train.  Defendants have not set forth a legitimate, non-discriminatory reason for this failure.  Thus, the Court denies defendants' motion for summary judgment with respect to this claim.

    **2.**    **Retaliation Claim**

Wheeler maintains that, as a result of her complaints to management about lack of training, she suffered from retaliation.  In 1999, she went to the union to complain about lack of cross-training.  Dkt. # 320, Ex. G, Wheeler Decl., ¶ 4.  She contends that, as a result of this action and statements regarding her lack of training, she was further denied training opportunities and

"demoted" to the "graveyard shift."  Defendants contend that she failed to identify any acts of

retaliation in her deposition and conceded that she was not pursing a retaliation claim:

> Q: I don't see in this complaint any assertion that you believe that you have been
> retaliated against.  Is that correct?
> A: Yes.

Dkt. # 307, Ex. 4, Wheeler Deposition, at 120-21.  Moreover, defendants argue that "Wheeler can

point to no adverse employment action that was allegedly taken in retaliation for her protected

activity."  Dkt. # 307, at 19.  In response to defendants' motion for summary judgment, Wheeler

claims that she did not concede that she had no retaliation claim; she also contends that the adverse

employment action was her alleged demotion to the night shift.

The Court finds that defendants are entitled to summary judgment on Wheeler's retaliation

claim.  As was the case with Sanders' retaliation claim, Wheeler offers no evidence linking her

alleged "demotion" to her comments to managers.  Wheeler merely states that she "believed that

it was because she had told management that the females 'were getting less wages for not being

trained and that we were getting all the jobs that were nasty, dirty jobs.'" Dkt. # 320, at 26.

Wheeler's personal belief as to why she was given the "graveyard shift" is not sufficient to raise

a genuine issue of material fact.  Since Wheeler has failed to establish a prima facie case of

retaliation, the Court grants defendants' motion for summary judgment with respect to that claim.

## IV.

**IT IS THEREFORE ORDERED** that defendants' Motion for Summary Judgment or, in the Alternative, to Decertify and Their Motion for Summary Judgment on Plaintiffs' Individual Non-Class Claims (Dkt. # 293) is **granted in part and denied in part**. Defendants' motion to decertify the salary subclass is **granted**; but its motion to decertify the overtime subclass is **denied**. Defendants' motion for summary judgment on plaintiffs' overtime subclass claim is **granted**. Since the salary subclass is decertified, defendants' motion for summary judgment on plaintiffs' salary subclass claim is **moot**. With respect to the individual claims of gender discrimination, defendants did not move for summary judgment on the named class representatives' individual claims for salary and overtime discrimination; thus, those claims remain. Defendants' motion for summary judgment on Anderson's failure-to-promote claim, Sanders' retaliation claim, and Wheeler's retaliation claim is **granted**; defendants' motion for summary judgment on Sanders, Dobbs, and Wheeler's respective failure-to-train claims is **denied**. Plaintiffs' Renewed Motion for Certification of Rule 23(b)(3) Class (Dkt. # 298) is **moot**.

**DATED** this 18th day of October, 2006.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT